UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-22065-CIV-LENARD/GARBER

JERMAINE PATTERSON,

    Plaintiff,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security

    Defendant.
_____/

## REPORT AND RECOMMENDATION

THIS CAUSE is before the Court by Order of Reference from United States District Judge Joan A. Lenard. Pursuant to such reference, the Court has received plaintiff Jermaine Patterson's Motion for Summary Judgment [DE 28] and defendant Michael J. Astrue, Commissioner of Social Security's Motion for Summary Judgment [DE 27]. The Court has also received the concomitant responses and replies. The issues before this Court are whether the record contains substantial evidence to support the denial of benefits to the plaintiff and whether the proper legal standards were applied. After due consideration, the undersigned respectfully recommends that this case be reversed and remanded for the reasons set forth below.

## Background

**I.    Brief Statement of Facts.**

Patterson, aged thirty at the time of his injury, was admitted to the hospital on December 19, 2003 after sustaining multiple gun shot wounds to his abdomen and arm. DE 11-7 at 7. Patterson's liver was lacerated in multiple areas and required surgery that same day. DE 11-8 at 58. He also had

to undergo multiple procedures and operations thereafter in order to stabilize his wounds and internal injuries. DE 11-8 at 2 to 62. It appears from the record that he remained in critical condition until February 11, 2004, at which point he was considered to be stable enough to be transferred out of the intensive care unit. DE 11-8 at 3. He was ultimately discharged from the hospital on March 15, 2004, nearly three months after his injury. Notwithstanding the severity of Patterson's initial injuries, various medical assessments predicted that, barring complications, he would eventually regain his full intellectual and physical capabilities. DE 11-4 at 28; DE 11-7 at 10; DE 11-8 at 1. Despite these positive expectations, however, Patterson's injuries, in conjunction with his depression, have left him severely impaired though not to the extent that he automatically meets the criteria for a finding of disability.

## II.   Procedural History

Patterson filed an application for supplemental security income benefits on February 6, 2004 with an alleged onset date of December 19, 2003. DE 11-2 at 24 to 27. After his claim was denied initially and then again upon reconsideration, Patterson appealed the denial to an administrative law judge who, after a hearing, issued an unfavorable decision on September 24, 2007. DE 11-1 at 17 to 29. His request for a review was denied, rendering the ALJ's decision the final decision of the Commissioner and therefore subject to judicial review under 42 U.S.C. § 405(g). DE 11-1 at 4.

## III.   Regulatory Framework and Summary of the ALJ's Conclusions

Social Security Regulations outline a five-step, sequential evaluation process used to determine whether a claimant is disabled and eligible for supplemental security income: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity

of the specified impairments in the "Listing of Impairments;"[1] (4) based on a residual functional capacity assessment, whether the claimant can perform any of his past relevant work despite the impairments; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's residual functional capacity, age, education, and work experience.  See  20 C.F.R. § 416.920 (a)-(g).

Here, the ALJ determined that: (1) Patterson is not engaged in substantial gainful activity; (2) he suffers from severe impairments due to his injuries and his depression; (3) his impairments do not, however, meet the criteria of a listed impairment; (4) his impairments prevent him from performing any of his past relevant work; but (5) significant numbers of jobs exist in the national economy that Patterson can perform, despite his impairments' limiting him to "less than a full range of sedentary work."  DE 11-1 at 22 to 29.

**Standard of Review**

The ALJ's decision is reviewed to determine if it is supported by substantial evidence and based on proper legal standards.  Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003) (internal citations omitted).  Such substantial evidence must be "more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Id. (internal citations omitted).  As long as the ALJ's decision is supported by substantial evidence, it will be affirmed–"[e]ven if the evidence preponderates against the ALJ's findings."  Id. (internal citations omitted).  "Substantial evidence" is generally defined as evidence which a reasonable person would accept as adequate to support a conclusion.  Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996).  The Court may not, however, reweigh the evidence or substitute its own judgment for that of the

---

[1] This list is found at 20 C.F.R. Part 404, Subpart P, Appendix 1. Certain impairments are so severe, whether considered alone or in conjunction with other impairments, that if they are established, the regulations require a finding of disability without further inquiry into the claimant's ability to perform other work.  Gibson v. Heckler, 762 F.2d 1516, 1518 n. 1 (11th Cir. 1985). If not so established, as in this case, the analysis proceeds to step four.

ALJ, regardless of whether the Court feels it would have resolved conflicts in the evidence differently had it reviewed the record and heard the testimony in the first instance. Id. On the other hand, there is no presumption of validity that attaches to the ALJ's conclusions of law, including a determination of the appropriate legal standards in deciding a claim for benefits. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991).

## Discussion

Patterson argues that the ALJ erred by: rejecting certain medical opinions, or portions thereof; substituting her own "hunch" in place of those medical opinions; disregarding portions of Patterson's own statements; according too much weight to certain assessments; and failing to consult with a vocational expert with respect to step five of the sequential analysis. The Court explains below why it disagrees with all but Patterson's argument regarding the consultation of a vocational expert.

**I.     Rejection of Medical Opinions**

**A.     Drs. Patricia Aurdien and Jozef Hudec's Opinions**

If a claimant is determined to be unable to remain seated for a total of six hours in an eight-hour work day, then his or her access to unskilled sedentary occupations is considered to be eroded. Soc. Sec. Ruling 96-9P, 1996 WL 374184 at *6. Such a finding, then, would necessarily affect an ALJ's determination at step five of the analysis. Here, both Drs. Aurdien and Hudec, two of Patterson's examining physicians, opined that Patterson was able to sit for up to only four hours total in an eight-hour workday. Specifically, Dr. Aurdien concluded that Patterson is only able to sit for a total of three to four hours in an eight-hour work day because of a bullet lodged in his thoracic spine. DE 11-3 at 17. Dr. Hudec stated that Patterson could sit for only four hours in an eight-hour work day but didn't explain why Patterson had such a limitation. DE 11-3 at 9. The ALJ disregarded both opinions. Patterson contends that because these two opinions are consistent with one another,

as well as with the medical documentation on record, the ALJ's rejection of the assessments was improper.

The Commissioner counters, first, that Dr. Hudec's opinion is inconsistent with other evidence in the record–both with Dr. Hudec's own findings as well as Patterson's testimony. Dr. Hudec's report states that Patterson's musculoskeletal joint groups and ranges of motion are within normal limits, that he has normal tone throughout his musculature, and that, upon examination, he is in no apparent distress. DE 11-3 at 6 to 7. These physical findings, the ALJ concluded, conflicted with Dr. Hudec's conclusions regarding Patterson's restrictive sitting limitations. DE 11-1 at 28. Furthermore, and as found by the ALJ, Patterson's own testimony at the administrative hearing, that he could sit for five to seven hours at a time, is also incompatible with Dr. Hudec's assessment of Patterson's sitting limitations. DE 11-8 at 88.

The Commissioner also argues that Dr. Aurdien's restrictive sitting assessment likewise suffers from similar defects. The sole reason given by Dr. Aurdien to support her finding that Patterson could sit for a total of only three to four hours in an eight-hour work day was that he has a bullet lodged in his thoracic spine. DE 11-3 at 17. However, except for Patterson's own testimony at the administrative hearing[2] and self-reported concerns to his psychiatrist,[3] there is no other evidence in the record, including Patterson's extensive post-operation follow-up documentation, that Patterson can point to, that would support the presence of such a bullet in his thoracic spine.[4] Further, as noted by the ALJ, Patterson only sporadically complained of pain and often reported no pain.[5] Additionally, his post-operative treatment history was also fairly conservative and his medical

---

[2]Patterson testified: "I still got a bullet back up there but they can't touch that []," DE 11-8 at 87; and "There's a bullet back there. They said [] it'll end up coming out one way, one day. They said it'll come out by itself," DE 11-8 at 87 to 88.

[3]His psychiatrist noted that Patterson was "afraid of bullet traveling" and quoted him as saying, "I still have one in my back." DE 11-3 at 27.

[4]DE 11-8 at 37 (no abnormalities reported, on December 23, 2003, upon visualization of Patterson's thoracic spine).

[5]E.g., record citations infra notes 6 and 11.

examinations were often deemed normal.[6]

The sitting limitations noted by Drs. Aurdien and Hudec, then, stand in contrast to other medical evidence in the record, as well as to Patterson's own testimony. The Court therefore agrees with the Commissioner that the record evidence with respect to the amount of time Patterson can sit within an eight-hour work day is conflicting. While the Court might not have resolved the conflict in the same way that the ALJ did, it is the ALJ, and not the Court, that is charged with weighing the evidence and resolving material conflicts in the testimony. Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). The ALJ properly noted the conflict between the restrictive sitting limitations assessed by Drs. Aurdien and Hudec and other evidence in the record and clearly articulated the grounds upon which she rejected their opinions on the matter. As discussed above, the ALJ's decision to disregard the restrictive sitting limitations is supported by substantial evidence in the record which could reasonably lead to a contrary conclusion. Because of this, the Court affirms the ALJ's decision to disregard portions of Drs. Aurdien and Hudec's opinions.

**B.     Dr. Alba Abreu's Opinions**

Though not raised in his Motion for Summary Judgment, Patterson argues in his response to the Commissioner's Motion for Summary Judgment that the ALJ also erred in rejecting the opinion of Dr. Alba Abreu, Patterson's treating psychiatrist. The ALJ recognized that Patterson's depression

---

[6] E.g., DE 11-8 at 1 (Dr. Rodriguez reported that, on February 6, 2004, Patterson was expected to regain his full intellectual and physical capabilities, barring any complications); DE 11-7 at 10 (a medical consultant concluded, on February 13, 2004, that no functional limitation was ultimately expected despite the severity of Patterson's initial injuries); DE 11-6 at 26 (a report from May 11, 2004 noted that although Patterson complained of a pain level of eight out of ten, his wound had good granulation tissue and he was directed to come back for a follow up in one month); DE 11-6 at 24 (on July 13, 2004 Patterson was again directed to come back for a follow up in one month for a wound check); DE 11-6 at 22 (Patterson's wound was reportedly healing well and he didn't appear to be taking any medication on August 12, 2004); DE 11-6 at 14 (an October 8, 2004 medical report showed that Patterson was not in any pain and was not taking any medication); DE 11-6 at 13 (an October 29, 2004 showed that Patterson was not in any pain, that his wound was healing "very well," and that he was not taking any medication); DE 11-6 at 9 (though Patterson, on May 12, 2005, complained of a daily pain level of seven out of ten, he was not taking any medication, his wound was reportedly clean and dry, and he was told to return to the clinic in three months for a follow up); 11-6 at 3 (a physician record from June 28, 2006 showed that although Patterson reported abdominal pain, he was not taking any medication); see also record citations infra note 11.

was severe, but she did not find Dr. Abreu's assessment of its extreme intensity to be credible. As the Commissioner explains, an ALJ may reject a treating physician's opinion by clearly articulating good cause to do so. Phillips v. Barnhart, 357 F.3d 1232, 1240-41 (11th Cir. 2004).  Good cause can be demonstrated by a showing of any of the following: (1) the treating physician's opinion is not supported by the evidence; (2) the record evidence supports a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.  Id.

Here, in support of her decision, the ALJ noted evidence in the record that supported findings contrary to those of Dr. Abreu.  For example, in contrast to Dr. Abreu's reports, Patterson's treatment notes from his numerous medical checkups repeatedly show that he had a normal mood and affect.[7]  A psychological evaluation conducted in August 2007 observed that Patterson's "thought processes appeared logical and coherent."  DE 11-2 at 55.  This same evaluation reported that Patterson denied having any hallucinations.  DE 11-3 at 1.  A medical source statement opining on Patterson's mental ability to do work-related activities noted that Patterson could understand, remember, and carry out simple as well as complex instructions and that he could make judgments regarding simple and complex work-related decisions.  DE 11-3 at 2.  This source statement also reported that Patterson was not limited in his ability to interact appropriately with people in a work setting or to respond properly to changes in a work setting.  DE 11-3 at 3.  There is evidence, then, that supports a finding contrary to Dr. Abreu's restrictive assessments that Patterson: has no ability to relate to co-workers, deal with the public, interact with supervisors, deal with work stress or maintain attention and concentration; has no ability to understand, remember, and carry out complex or detailed job instructions; and has only a poor ability to carry out simple job instructions.

The ALJ further noted, and Patterson did not deny, that he had missed multiple appointments and was non-compliant with his medication regimen.  Patterson argues that the ALJ improperly

---

[7]E.g., record citations infra note 11.

considered his non-compliance in assessing his symptoms and their functional effects. However, in this instance, the ALJ was referring to Patterson's noncompliance only in relation to Dr. Abreu's assessment of Patterson. That is, one of the factors the ALJ considered in discrediting the opinion was that <u>Dr. Abreu</u> failed to take Patterson's noncompliance into consideration when making her assessments.[8] Patterson may very well have had legitimate reasons for not taking his medication and for missing appointments. But this is not the issue. This is not a case where, as Patterson suggests, an ALJ has relied on a claimant's noncompliance as the sole ground for denying disability benefits. The ALJ merely pointed to the <u>doctor's</u> failure to take a claimant's noncompliance into account when formulating her assessment as one factor among many for discrediting that doctor's conclusions.

The Court finds that the ALJ properly articulated her reasons for rejecting Dr. Abreu's opinion and that this decision is supported by substantial evidence in the record. Her decision in that regard is affirmed.[9]

## II.     Substitution of ALJ's "Hunch" for Medical Opinions

Patterson also contends that the ALJ improperly substituted her own opinion for that of the medical experts in determining that Patterson could remain seated for up to six hours in an eight-hour workday. According to Patterson, once the ALJ rejected Drs. Aurdien and Hudec's opinions on his sitting restrictions, there was no substantial evidence in the record upon which the ALJ could have relied in reaching her conclusion. The Court disagrees with Patterson's assessment of the record in this regard.

In support of his position that the ALJ improperly formulated her own conclusions, Patterson

---

[8] DE 11-1 at 25 (The ALJ noted that "despite being aware that the claimant was non-compliant, [Dr. Abreu] failed to take into consideration these circumstances and instead based her comments mostly on the claimant's self-reports, without any further testing.").

[9] Patterson also argues that the ALJ improperly factored into her analysis that Patterson sought psychiatric treatment only at the urging of his attorney. While the ALJ mentioned this, Patterson does not point to, nor did the Court find, any evidence in the record that the ALJ relied on this fact in disregarding Dr. Abreu's opinion. The Court therefore finds this argument to be without merit.

cites to cases in which the ALJ did not have a fully developed record upon which to rely.[10] The Court disagrees with Patterson's reliance on these cases as well as his characterization of the record. First, although the ALJ rejected Dr. Aurdien's opinion in its entirety, she only rejected Dr. Hudec's assessment in part. Further, the record contains multiple medical progress reports completed by examining physicians, as well as hospital and clinic evaluations which form part of a fully developed record.[11] Lastly, Patterson himself testified that he could sit for up to seven hours at a time.[12] This is not, as Patterson has alleged, a case where the ALJ rejected the opinion of the only doctor or doctors who provided evidence in a case and then arbitrarily came up with her own conclusions. The ALJ's residual functional capacity findings are supported by substantial evidence in the record–her conclusions were not plucked out of thin air, as Patterson has argued. As such, the ALJ's findings in this regard are sustained.

### III.   Disregarding of Portions of Patterson's Own Statements

Patterson further asserts that the ALJ improperly disregarded portions of his testimony. He claims that the ALJ discredited his claims and testimony solely because he missed medical appointments, neglected to take his medication, sought medical treatment late in the process, and only

---

[10] E.g., Coleman v. Barnhart, 264 F. Supp. 2d 1007 (S.D. Ala 2003) (finding that the ALJ's "fifth-step burden cannot be met by a lack of evidence, or by the residual functional capacity assessment of a non-examining, reviewing physician, but instead must be supported by the residual functional capacity assessment of a treating or examining physician"); Nunez v. Comm'r, 2007 WL 4365657, at *8 (M.D. Fla. 2007) ("The ALJ potentially could have developed the record by obtaining medical records from [the claimant's] treating chiropractor or by ordering a consultative examination, but he did not. Remand is appropriate where the ALJ fails to develop a full and fair record of the claimant's residual functional capacity.").

[11] E.g., DE 11-5 at 10 (Notes from the Jackson Health System show that, on February 10, 2006, Patterson reported a pain level of zero out of ten and his extremities, gait, mood, and affect were normal); DE 11-5 at 6 (Notes from the Jackson Health System show that, on May 12, 2006, Patterson reported a pain level of two out of ten and his extremities, mood, and affect were normal); DE 11-4 at 32 (Notes from the Jackson Health System show that, on July 6, 2006, Patterson reported a pain level of zero out of ten and his extremities, gait, mood, and affect were all normal upon inspection); DE 11-3 at 7 (Dr. Hudec's July 25, 2007 assessment of Patterson noted that Patterson's affect was good, that he had no hallucinations or delusions, that his memory was intact, that his cognition, calculations, abstraction, and executive functions are all good; his physical examination revealed that though Patterson had restrictions in lifting, pushing, and pulling, walking, and climbing, he had no limitations relating to hand dexterity or strength; no communicative limitations with regard to speech or hearing or emotional impairment in functioning within work/social environment); see also record citations supra note 6.

[12] DE 11-8 at 88 (Patterson: "[T]he longest that I do sit is at least about five, six, seven hours before I move.").

sought medical treatment intermittently.[13] The Court agrees that these factors, <u>taken alone</u>, would likely not constitute substantial evidence supporting the ALJ's decision to discredit portions of Patterson's testimony and claims. <u>E.g.</u>, <u>Dawkins v. Bowen</u>, 848 F.2d 1211, 1212 (11th Cir. 1988) (remanding where it appeared that ALJ denied disability benefits based solely on claimant's noncompliance with prescribed medical treatment).

However, the above-listed factors were only few among many articulated by the ALJ to support her findings that, although she found Patterson's impairments to be severe, his "statements concerning the intensity, duration and limiting effects of [his] symptoms are not entirely credible." DE 11-1 at 29. For example, the ALJ also noted that an evaluation conducted by state licensed psychologist Dr. Alejandro J. Arias concluded that, despite clearly suffering from residual emotional disturbances associated with his gun shot wounds, Patterson's impairments did not affect his ability: to understand, remember, and carry out instructions; to interact appropriately with supervisors, co-workers, and the public; or to respond to changes in a routine work setting. DE 11-3 at 2 to 3. Additionally, Patterson was found to have over-endorsed his psychopathological features during one of the tests administered by Dr. Arias. DE 11-3 at 1. And, as articulated by the ALJ, many of Patterson's treatment and post-operative follow-up records contradicted his claims regarding the severity of symptoms, both physical and psychological.[14]

While there are also medical evaluations in the record that are consistent with Patterson's claims, the ALJ articulated substantial evidence that supports her decision to disregard some of his testimony. Again, while the Court may have resolved the discrepancies in the record differently, the Court must accept the ALJ's decision where it is supported by substantial evidence and her findings

---

[13]Patterson also complains that the ALJ was biased against him but he has not pointed to, nor has the Court been able to find, any evidence in the record indicating, or even implying, that this was so. The Court therefore finds this allegation of bias unavailing.

[14]<u>E.g.</u>, record citations <u>supra</u> notes 6 and 11.

in this regard are therefore sustained.

**IV.    According of Too Much Weight to Certain Assessments**

    **A.    Dr. Alejandro J. Arias' Opinion**

Patterson maintains that the ALJ should not have accorded Dr. Arias' opinion (discussed, in part, in the previous section) any weight. The Court finds Patterson's arguments in this regard unavailing. The only case law cited by Patterson to support his position, is <u>Kent v. Sullivan</u>, 788 F. Supp. 541 (N.D. Ala. 1992). Patterson cited to <u>Kent</u> for the proposition that the "report of a consulting physician who examined the claimant once does not constitute 'substantial evidence' upon the record as a whole, especially when contradicted by the evaluation of the claimant's treating physician." 788 F. Supp. 541 at 544 (internal quotations omitted). While it is true that Dr. Arias' opinion <u>alone</u> might not have sufficed to support the ALJ's conclusion, this was just one opinion among many that the ALJ articulated as supporting her position. Patterson's characterization to the contrary is misleading.[15] The ALJ's decision to accord "significant weight [to Dr. Arias' assessment] as supported by the objective medical evidence of record" is therefore sustained. DE 11-1 at 28.

    **B.    Dr. Ivan Rodriguez's Opinion**

On February 6, 2004, less than two months after Patterson sustained his injuries, Dr. Rodriguez completed a "Statement of Patient's Capability to Manage Benefits" form in which he concluded that, barring complications, Patterson should be able to regain full intellectual and physical capabilities. DE 11-7 at 11 to DE 11-8 at 1. The ALJ pointedly notes in her decision that she only accorded this opinion significant weight in terms of Patterson's condition early in his treatment. Her decision reflects an understanding that the opinion was not intended to reflect the claimant's functioning during the pertinent period at issue in her decision. Contrary to Patterson's assertions,

---

[15]Patterson also cites to Social Security Ruling 96-8P but without reference to a specific page within that document. Upon review of that ruling in its entirety, the Court is unable to find any support therein for Patterson's position.

the ALJ did not accord "great weight" to this assessment. Thus, his complaints about the impropriety of the ALJ's reliance on this assessment are unfounded.

### V.    Reliance on the Medical-Vocational Guidelines Versus Consultation with a Vocational Expert

Finally, Patterson objects to the ALJ's reliance on the medical-vocational guidelines (often referred to as the "grids") to determine, at step five in the analysis, that there are jobs that exist in significant number in the national economy that the claimant can perform.[16] Patterson argues that, because the ALJ determined that his residual functional capacity did not permit him to perform the full range of sedentary work, the ALJ was required to consult a vocational expert rather than rely solely on the grids.[17] The Commissioner maintains, without much elaboration, that the ALJ's reliance on the grids was proper. The Court finds Patterson's objection is well-founded.

Eleventh Circuit case law requires an ALJ to consult a vocational expert when either: (1) the claimant is unable to perform a full range of work at a given residual functional level; or (2) the claimant has nonexertional[18] impairments that significantly limit basic work skills. Phillips, 357 F.3d 1240. Here, the ALJ concluded that Patterson is unable to perform a full range of work at the sedentary level.[19] This conclusion alone mandates reversal and remand so that the ALJ can consult a vocational expert under the first condition outlined in Phillips.

---

[16] These guidelines, found at 20 C.F.R. Part 404, Subpart P, Appx 2, take administrative notice of the numbers of unskilled jobs that exist throughout the national economy at various functional levels: sedentary work, light work, medium work, and heavy work.

[17] A vocational expert is an expert on the kinds of jobs a claimant can perform based on his capacity and impairments. Phillips, 357 F.3d at 1240.

[18] Exertional limitations are defined as those restrictions that affect a person's ability to meet what the Social Security Administration considers the seven strength demands of a job: sitting, standing, walking, lifting, carrying, pushing, and pulling. Social Security Ruling 96-9P, 1996 WL 374185 at *5 (July 2, 1996). Nonexertional limitations, on the other hand, relate to limitations that affect capacities such as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching and the like. Id. Environmental restrictions are also considered to be nonexertional limitations. Id.

[19] DE 11-1 at 29 ("Accordingly, I conclude that during the adjudicated period, the claimant retained the physical residual functional [sic] to perform less than a full range of sedentary exertional work. After careful consideration of the entire record, I find that throughout the adjudicated period, the claimant retained the residual functional capacity to perform less than a full range of sedentary exertional work.") (emphasis added).

With respect to nonexertional limitations, the second condition, the ALJ did not explicitly articulate whether Patterson's basic work skills were significantly limited or not. She noted only that Patterson had limitations with respect to overhead arm movements,[20] that he could only occasionally crawl, kneel, and crouch, and that he could not climb ladders, ropes, or scaffolds.[21] While these nonexertional limitations don't necessarily require consulting a vocational expert, the ALJ failed to make specific findings as to whether Patterson's particular limitations are severe enough, perhaps in combination, to significantly limit his employment opportunities. Thus, if the ALJ determines, upon remand and in consultation with a vocational expert, that Patterson is not disabled under the first condition outlined in Phillips, despite his exertional limitations, the ALJ then must make particular findings with respect to Patterson's nonexertional limitations. Phillips, 357 F.3d at 1243 (requiring the ALJ to "determine whether [a claimant's] nonexertional impairments significantly limit her basic work skills"). And, if she determines that Patterson's nonexertional limitations are severe enough, a vocational expert must be consulted in this regard as well. Id. at 1244 (quoting Foote v. Chater, 67 F.3d 1553, 1559 (11th Cir. 1995)).

### Conclusion and Recommendation

The Court finds that the ALJ erred by relying solely on the grids to determine Patterson's eligibility for benefits and not consulting a vocational expert as required by Phillips. The ALJ's decision in all other respects is affirmed. For this reason, and as set forth more fully in Section V, above, the undersigned respectfully

RECOMMENDS that the decision of the Commissioner be REVERSED and REMANDED for a redetermination of the step-five analysis consistent with Phillips.

---

[20] DE 11-1 at 29 ("[D]ue to the central ventral hernia [Patterson] could only occasionally reach overhead while lifting. . . . The claimant could frequently balance and continuously reach, push and pull with his arms in all directions, except overhead, which he could do only occasionally.")

[21] DE 11-1 at 29.

Accordingly, it is also the recommendation of the undersigned that Patterson's Motion for Summary Judgement [DE 28] be GRANTED IN PART and DENIED IN PART and that the Commissioner's Motion for Summary Judgment [DE 27] be DENIED.

Pursuant to Local Magistrate Judge Rule 4(b), the parties have fourteen days from the date of this Report and Recommendation within which to file written objections, if any, with the Honorable Joan A. Lenard, United States District Judge. See also 28 U.S.C. § 636. Failure to file timely objections may bar the parties from attacking on appeal the factual findings contained herein. LoConte v. Dugger, 847 F.2d 745, 750 (11th Cir. 1988), cert. denied, 488 U.S. 958 (1988).

RESPECTFULLY SUBMITTED at the United States Courthouse, Miami, Florida this 10th day of February, 2011.

_____
BARRY L. GARBER
UNITED STATES MAGISTRATE JUDGE